IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| AMBER L. GIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | Judge: _____ |
| OAK RIDGE ASSOCIATED UNIVERSITIES, INC., | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, AMBER L. GIFFIN, and she hereby sues the Defendant, and for cause of action would show unto this Honorable Court as follows:

1. The Plaintiff, Amber L. Giffin, is a citizen and resident of Knoxville, Knox County, Tennessee.

2. The Defendant, Oak Ridge Associated Universities, Inc., is a domestic corporation authorized to do business in the State of Tennessee, with its principal place of business located at 100 ORAU Way, Oak Ridge, Tennessee 37830-6209. Service of process may be served through the Defendant's Registered Agent, Rachel F. Lokitz, 100 ORAU Way, Oak Ridge, Tennessee 37830-6209.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because it involves claims arising under Federal law, to-wit: 29 U.S.C. § 2601, *et seq.*, 42 U.S.C. § 12101, *et seq.*, and 42 U.S.C. § 1981a, and the doctrine of Supplemental Jurisdiction pursuant to 29 U.S.C. § 1367.

4. Venue is proper pursuant to the code provisions of 29 U.S.C. § 1391.

5. The Plaintiff, at all times stated herein, worked for Defendant at 100 ORAU Way, Anderson County, Oak Ridge, Tennessee.

6. The Defendant is an employer engaging in an industry affecting commerce and employs more than fifty (50) employees.

7. The Defendant is an employer subject to the provisions of the Family Medical Leave Act (hereinafter "FMLA"), 29 U.S.C. § 2601, *et seq*.

8. At all times stated herein, the Defendant was, and currently is, an "employer" and "covered entity" within the meaning of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12101, *et seq*.

9. At all times stated herein, the Defendant was an employer subject to the provisions of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

10. At all times stated herein, the Defendant was an employer subject to the Tennessee Disabilities Act, Tenn. Code Ann. § 8-50-103.

11. The Americans with Disability Act, 42 U.S.C. § 12101, *et seq*., defines "disability" as follows:

   1.) Disability: The term "disability" means, with respect to an individual-
      A.) a physical or mental impairment that substantially limits one or more major life activities of such individual;
      B.) a record of such an impairment; or
      C.) being regard as having such an impairment (as described in paragraph (3)).

   2.) Major Life Activities:
      A.) In general
         For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
      B.) Major bodily functions
         For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel,

2
Case 3:19-cv-00134   Document 1   Filed 04/17/19   Page 2 of 16   PageID #: 2

bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.…

C.) An individual meets the requirements of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

12. Equal Employment Opportunity Commission's (hereinafter "EEOC") regulations define "impairment," in part, as:

"(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems, neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; …" 29 C.F.R. § 1630.2 (emphasis added).

13. EEOC's regulations define "major life activities," in part, as including, but not limited to:

"(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentration, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system." 29 C.F.R. § 1630.2 (emphasis added).

14. The Plaintiff was originally hired by Oak Ridge Associate Universities ("ORAU") on April 26, 2016, as an Administrative Associate.

15. During her employment, she reported to Associate Director, Craig Layman.

16. At all times herein, Craig Layman was an agent and employee of the Defendant.

17. At all times herein, Craig Layman had the authority to terminate the Plaintiff.

3
Case 3:19-cv-00134   Document 1   Filed 04/17/19   Page 3 of 16   PageID #: 3

18. At all times herein, Craig Layman had the authority to write up the Plaintiff for a disciplinary reason.

19. At the time of Plaintiff's termination, as hereinafter alleged, Craig Layman reported to David Duncan, Senior VP and Program Director.

20. At all times herein, David Duncan was an agent and employee of Defendant.

21. During Plaintiff's employment, she received one raise.

22. During Plaintiff's employment, she did not receive a written disciplinary notice of any kind except with respect to the termination document hereinafter mentioned.

23. During Plaintiff's employment, she received one evaluation which was excellent.

24. Plaintiff's supervisor, Craig Layman, granted Plaintiff access to his emails in or around May, 2016.

25. Plaintiff's supervisor, Craig Layman, granted Plaintiff access to his emails in or around May, 2016, because he wanted Plaintiff to monitor, check, reply to his emails for him, and for other reasons.

26. After Craig Layman decided to grant Plaintiff access to his emails, he requested Defendant's IT Department to grant Plaintiff access to his emails.

27. During Plaintiff's employment, she routinely accessed Dr. Layman's emails.

28. Plaintiff's supervisor, Craig Layman, granted Plaintiff access to his Outlook calendar in or around May, 2016.

29. Plaintiff's supervisor, Craig Layman, granted Plaintiff access to his Outlook calendar because he wanted Plaintiff to monitor, check, make entries to his calendar, and for other reasons.

30. After Craig Layman decided to grant Plaintiff access to his Outlook Calendar, he requested Defendant's IT Department to grant Plaintiff access to his Outlook calendar.

31. During Plaintiff's employment, she routinely accessed Dr. Layman's Outlook calendar.

32. In the late-July or early-August 2017 timeframe, the Plaintiff's supervisor, Craig Layman, learned the Plaintiff suffered from anxiety, depression, and Post Traumatic Stress Disorder ("PTSD").

33. In the late-July or early-August 2017 timeframe, the Defendant's Director of Employee Relations, Mae Mosley, learned the Plaintiff suffered from anxiety, depression, and PTSD.

34. At all times hereinafter stated, Mae Mosley was an agent and employee of Defendant.

35. Anxiety is a condition that affects one or more major life activities as defined by the law and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

36. Anxiety is a condition that can substantially limit one or more major life activities as defined in the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

37. Anxiety is a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

38. Depression is a condition that affects one or more major life activities as defined by the law and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

39. Depression is a condition that can substantially limit one or more major life activities as defined by the law and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

40. Depression is a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

41. PTSD is a condition that affects one or more major life activities as defined by the law and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

42. PTSD is a condition that can substantially limit one or more major life activities as defined by the law and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

43. PTSD is a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

44. After her supervisor, Craig Layman, discovered Plaintiff's medical condition as set forth in Paragraph 32, he became cold and standoffish towards Plaintiff, and he began making negative comments about Plaintiff's medical condition.

45. In the September to October 2017 timeframe, Plaintiff applied for intermittent FMLA leave since she was the caretaker of her father.

46. When Plaintiff was granted FMLA leave, her father suffered from a serious heart condition and was going to have his second open heart surgery.

47. Defendant approved Plaintiff's application for intermittent FMLA leave to care for her father.

48. After the Plaintiff was granted Intermittent FMLA leave to care for her father, Craig Layman started giving the Plaintiff a hard time concerning her use of FMLA leave, as well as continuing to discuss Plaintiff's medical condition in a derogatory fashion.

49. As Plaintiff would utilize FMLA related to her father, her supervisor, Craig Layman, got angry with her for using FMLA leave on more than one occasion, including a time when her father was in a medically induced coma.

50. Craig Layman also accused the Plaintiff of abusing FMLA on other occasions when she had to go to the hospital because the hospital staff told Plaintiff that her father was dying.

51. The Plaintiff's father died on January 9, 2018.

52. The Plaintiff's supervisor, Craig Layman, had knee surgery in or around January of 2018, and was out of work for about six weeks, but when he returned to work, his hostile treatment of Plaintiff worsened.

53. In March, 2018, the Plaintiff's stress level had increased due in part to the fact that her Father had died in January of 2018, a cousin had died in February of 2018, a co-worker whom Plaintiff was close to had died in March of 2018, and due to her supervisor's hostile treatment of her, and Plaintiff advised Craig Layman that she needed to take a PTO day, and this angered him.

54. The Plaintiff's supervisor, Craig Layman increased hostility towards Plaintiff up to the point that the Plaintiff complained in or about March of 2018 to Mae Mosley, Director of Employee Relations, about Mr. Layman's hostile treatment of her in connection with her use of FMLA leave, her disabilities and medical condition, his creation of a hostile work environment related thereto, and the fact that his actions were exacerbating Plaintiff's medical condition.

55. In retaliation, Craig Layman began forwarding emails to or from the Plaintiff and/or about the Plaintiff to his supervisor, the Senior VP and Program Director, David Duncan, and to others, exposing Plaintiff's medical condition without her knowledge or approval. (*See* attached Exh. 1).

56. In or around early-April, 2018, Plaintiff accessed her supervisor, Craig Layman's email as was routine for Plaintiff as part of her job duties. On this occasion, she accessed Mr. Layman's email in order to try to locate a PowerPoint presentation that he had sent her previously that she could not locate on her computer hard-drive. When she searched her name, Plaintiff discovered emails Mr. Layman had sent Mae Mosley and others that made it clear he was documenting her file in connection with her medical condition and/or her use of FMLA leave, and that he was discussing her private medical condition with co-workers without Plaintiff's knowledge or approval.

57. When Craig Layman discovered Plaintiff had seen the negative emails that he had been sending about the Plaintiff, he was livid and he yelled at Plaintiff, and he threatened to revoke Plaintiff's access to his emails, and he said words to the affect that she needed to get her mental illness under control, and he also stated that he would be gone for a few days and when he got back, Plaintiff needed to prove he could trust her.

58. Craig Layman did not notify the Defendant's IT Department to revoke Plaintiff's access to his email account.

59. Thereafter, Craig Layman continued to give Plaintiff assignments that required her to access his email account.

60. In or around early-April 2018, the Plaintiff complained to Mae Mosley in Human Resources about Craig Layman's threatening, retaliatory, and discriminatory conduct, and explained that his behavior was exacerbating her mental illness and medical condition.

61. The Plaintiff and Mae Mosley specifically discussed that Plaintiff's access to Craig Layman's email account had not been revoked, and that Craig Layman had continued giving Plaintiff assignments that required her to access his email account. Ms. Mosely never instructed

Plaintiff to stop accessing Mr. Layman's email account. Further, at this time, Plaintiff specifically requested as a reasonable accommodation due to her medical condition for her to be transferred to a different supervisor, even with a cut in pay.

62. Prior to her termination, on more than one occasion, Plaintiff repeated her request that as a reasonable accommodation for her to be assigned to a different supervisor, but at no time did the Defendant engage in an interactive process in good faith regarding these requests, and Defendant denied the Plaintiff's requests.

63. A transfer to a different position due to a disability is a reasonable accommodation as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

64. The request to be transferred to a different position due to a disability is a request for a reasonable accommodation as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

65. Approving the Plaintiff's requests to be transferred to a different position would not have imposed an undue hardship on the Defendant as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

66. Prior to Plaintiff's termination, Mae Mosley offered to conduct a mediation between Plaintiff and her supervisor, Craig Layman, in an attempt to improve their relationship.

67. Plaintiff agreed to attend the mediation with Mae Mosely and Craig Layman.

68. When Craig Layman was informed of the mediation with the Plaintiff, he got angry.

69. When Craig Layman was informed of the mediation with the Plaintiff, he refused to attend.

70. After Craig Layman refused to attend the mediation, Mae Mosley informed her boss, Meghan Millwood, Vice President of Human Resources, of Mr. Layman's refusal to mediate.

71. At all times stated herein, Meghan Millwood was an agent and employee of Defendant.

72. The next day Craig Layman met with Meghan Millwood and his boss, David Duncan.

73. Craig Layman was infuriated by having to meet with Meghan Millwood and his boss, David Duncan, regarding the Plaintiff.

74. However, the proposed mediation with Plaintiff and Craig Layman never took place.

75. On or about April 7, 2018, Plaintiff provided Mae Mosley a letter from Plaintiff's medical provider stating Plaintiff's need for a reasonable accommodation. (A copy of this letter is attached as Exh. 2).

76. The letter from Plaintiff's medical provider (Exh. 2) constitutes a request for a reasonable accommodation as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

77. The content of Plaintiff's medical provider's letter (Exh. 2) required Defendant to engage in the interactive accommodation process in good faith.

78. Defendant received and reviewed the letter (Exh. 2) from Plaintiff's medical provider requesting a reasonable accommodation.

79. Mae Mosley received and reviewed the letter (Exh. 2) from Plaintiff's medical provider requesting a reasonable accommodation.

80. Craig Layman received and reviewed the letter (Exh. 2) from Plaintiff's medical provider requesting a reasonable accommodation.

81. Meghan Millwood received and reviewed the letter (Exh. 2) from Plaintiff's medical provider requesting a reasonable accommodation.

82. Defendant did not engage in an interactive process with respect to Plaintiff's request for a reasonable accommodation as requested in Exhibit 2.

83. Defendant did not grant Plaintiff's request for the reasonable accommodation as requested in Exhibit 2.

84. On or about April 10, 2018, Plaintiff requested intermittent FMLA leave related to her medical condition.

85. At the time Plaintiff requested intermittent FMLA leave on or about April 10, 2018, the Plaintiff was eligible for FMLA leave.

86. However, after the Plaintiff requested the reasonable accommodation and intermittent FMLA leave, Craig Layman's treatment of the Plaintiff became much worse.

87. On or after April 10, 2018, Craig Layman became aware and/or had knowledge that Plaintiff requested intermittent FMLA leave. (*See* Email Concerning Plaintiff's Requested Intermittent FMLA Leave, attached hereto as Exhibit 3).

88. On or after April 10, 2018, Mae Mosley became aware and/or had knowledge that Plaintiff requested intermittent FMLA leave. (*See* Exh. 3).

89. On or after April 10, 2018, Meghan Millwood became aware and/or had knowledge that Plaintiff requested intermittent FMLA leave. (*See* Exh. 3).

90. On or after April 10, 2018, David Duncan became aware and/or had knowledge that Plaintiff requested intermittent FMLA leave. (*See* Exh. 3).

91. Craig Layman shared Plaintiff's request for intermittent FMLA leave with Kaye Allen.

92. At the time Craig Layman shared Plaintiff's report for intermittent FMLA leave, Kaye Allen's position was Associate Director of Business Development.

93. There was no legitimate reason for Craig Layman to share Plaintiff's request for intermittent FMLA leave information with Kaye Allen.

94. The Plaintiff complained of Craig Layman's retaliatory and discriminatory conduct, and again, instead of making her situation better following her complaints, Mr. Layman's hostility and his retaliatory conduct towards the Plaintiff intensified and worsened.

95. On or about April 16, 2018, Plaintiff's supervisor, Craig Layman, was requested to sign the approval of Plaintiff's request for FMLA leave as the "Manager". (*See* Exh. 3).

96. On April 16, 2018, Plaintiff's supervisor, Craig Layman, refused to sign the approval of Plaintiff's request for intermittent FMLA leave. (*See* Exh. 3).

97. On April 16, 2018, Plaintiff's supervisor, Craig Layman, complained to his boss, David Duncan, about Plaintiff's request for intermittent FMLA leave. (*See* Exh. 3).

98. Thereafter, as Plaintiff was accessing Craig Layman's email account as part of her job duties, she saw that Mr. Layman was refusing to sign the paperwork approving Plaintiff's request for intermittent FMLA leave that her medical provider thought was necessary, and Plaintiff was scared and concerned, and she went to the HR Department to speak with Mae Mosely about it, but Ms. Mosely was not in, so the Plaintiff spoke with Lauren Schaffer, Employee Relations and Diversity Specialist, and Plaintiff complained about Mr. Layman's retaliatory and hostile actions. When Ms. Schaffer was told that Plaintiff had learned about Layman's refusal to approve her FMLA via his email account, she instructed Plaintiff not to access his email account anymore.

99. When Lauren Schaffer told Plaintiff not to access Craig Layman's email account anymore, this was the first time Plaintiff had been told by anyone not to access Mr. Layman's email account, and Plaintiff did not access it from the point forward.

100. At all times stated herein, Lauren Schaffer was an agent and employee of the Defendant.

101. On April 17, 2018, the Plaintiff was informed by Mae Mosley that Craig Layman attended a meeting about the Plaintiff with Meghan Millwood, Vice President of Human Resources, Eric Ablequest, Executive Vice President and Chief Research Officer, and Ivan Boatner, General Counsel.

102. At this meeting on April 17, 2018, the Defendant made the decision to fire the Plaintiff.

103. On April 18, 2018, the Plaintiff was called into a meeting that took place in a room outside of the nurse's office with Lauren Schaffer, Employee Relations Manager, Craig Layman, Associate Director, and Mae Mosley, Director of Employee Relations.

104. At this meeting, Plaintiff was presented with a document accusing Plaintiff of going into Craig Layman's emails after being told not to, and for disseminating proprietary information, and that she was being terminated, and Plaintiff was requested to sign the termination document.

105. Plaintiff refused to sign the termination document because she had not been told not to access Craig Layman's email account, and Plaintiff did not disseminate proprietary information.

106. Plaintiff had been given permission to access Craig Layman's email, and the first time she was ever told not to access his email was in the meeting with Lauren Schaffer the day

13
Case 3:19-cv-00134   Document 1   Filed 04/17/19   Page 13 of 16   PageID #: 13

before, and she did not access Mr. Layman's email thereafter, and further she did not disseminate proprietary information.

107. Previously, Plaintiff had been authorized to access Craig Layman's emails in order to perform her job, and Mr. Layman asked her repeatedly to go into his emails to retrieve information even after threatening to remove Plaintiff's access to his email account.

108. After refusing to sign the false termination document, the Plaintiff asked for a copy of the document, but Defendant refused to give her a copy.

109. After refusing to sign the false termination document, the Plaintiff was then given the "choice" of resigning or being fired, and Plaintiff thereafter submitted the attached handwritten letter resigning her employment. (*See* Plaintiff's Resignation Letter, attached hereto as Exhibit 4).

110. Lauren Schaffer told Plaintiff they would give her a bad reference during employment verifications for future jobs if she did not resign and if she made them fire her.

111. Plaintiff's letter of resignation stated: "4/18/18. I am resigning from ORAU due to feeling discriminated against for my mental illness and for a hostile work environment." (Exh. 4).

112. The reasons given for Plaintiff's termination were pretextual.

113. The Plaintiff was fired on April 18, 2018, for a trumped-up reason.

114. Plaintiff filed a timely Charge of Discrimination and Retaliation with the Equal Employment Opportunity Commission (hereinafter "EEOC") on or about May 16, 2018. (EEOC Charge, attached hereto as Exhibit 5, and same is incorporated herein by reference).

115. The Plaintiff received a Notice of Right to Sue from the EEOC for her ADA claims dated April 10, 2019. (Notice of Right to Sue, attached hereto as Exhibit 6).

116. This suit is timely filed.

117. The Plaintiff alleges she was terminated in retaliation for exercising her rights to FMLA, 29 U.S.C. § 2601, *et seq.*, and/or in order to interfere with her right to FMLA leave. As such, Plaintiff hereby sues the Defendant for violating the FMLA, 29 U.S.C. § 2601, *et seq*.

118. The Plaintiff further alleges she was terminated due to her disability, and/or in retaliation for requesting and needing reasonable accommodations, and/or because Plaintiff was regarded as having a disability, and/or due to having a record of such an impairment, and/or because Defendant refused to engage in the interactive accommodation process in good faith, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA"), and the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-103. As such, Plaintiff hereby sues the Defendant for violating the ADA and the TDA.

119. On May 10, 2018, Plaintiff's attorney mailed a Notice of Non-Spoliation letter to Defendant requesting that certain potentially relevant evidence be preserved. (A copy of this letter is attached hereto as Exh. 7).

120. Defendant received the letter dated May 10, 2018 (Exh. 7).

121. The actions of the Defendant were willful in nature and sufficient to justify the imposition of liquidated damages.

122. As a result of Defendant's conduct, the Plaintiff has sustained, and will sustain, great emotional distress, humiliation, and embarrassment, and she sustained a loss of income and benefits, both past and future, and she incurred medical bills that would have been paid for by her health insurance had she not lost her benefits, and other pecuniary losses.

123. Defendant's conduct, as set forth in this Complaint, was malicious and in reckless disregard to Plaintiff's federally protected rights and is sufficient to justify the imposition of substantial punitive damages.

WHEREFORE, Plaintiff prays for judgment against the Defendant, and Plaintiff prays for the following relief:

1. Compensatory damages, including back pay and front pay (or in the Court's discretion, reinstatement);

2. Liquidated damages;

3. Punitive Damages;

4. Prejudgment interest;

5. Reasonable attorney's fees;

6. The costs of this action;

7. A jury to try this cause; and

8. Appropriate equitable relief, including, ordering Defendant to abide by the above-referenced statutes, and the applicable rules and regulations of the EEOC, and for key employees, including Craig Layman and David Duncan, and anyone else involved in Plaintiff's termination, to receive appropriate training.

RESPECTFULLY SUBMITTED this the 17th day of April, 2019.

          **THE BURKHALTER LAW FIRM, P.C.**

          s/David A. Burkhalter, II
          David A. Burkhalter, II, BPR #004771
          D. Alexander Burkhalter, III, BPR #033642
          Zachary J. Burkhalter, BPR #035956
          Attorneys for Plaintiff
          111 South Central Street
          P. O. Box 2777
          Knoxville, Tennessee 37901
          (865) 524-4974